**Julia ROSADO et al., Plaintiffs,**

**v.**

**George K. WYMAN et al., Defendants.**
**No. 69–C–355.**

United States District Court,
E. D. New York.

Oct. 27, 1970.

Steven Cole, Henry Freedman, Nancy Duff Levy, New York City, Staff Attys., Center on Social Welfare Policy & Law, for plaintiffs.

Louis J. Lefkowitz, Atty. Gen. of N. Y., by Amy Juviler, Asst. Atty. Gen., Edward R. Neaher, U. S. Atty., E. D. N. Y. by Cyril Hyman, Asst. U. S. Atty., Adele Blong, New York City, Office of the General Counsel, HEW, for defendants.

## MEMORANDUM AND ORDER

WEINSTEIN, District Judge.

A year and a half ago plaintiffs brought this action challenging the validity of section 131–a of the New York Social Services Law effective July 1, 1969. They alleged that it did not meet the standards set by section 402(a) (23) of the Social Security Act of 1935, as amended in 1968 (42 U.S.C. § 602(a) (23), referred to below as section 402), for participation by a state in the federally-funded Aid for Dependent Children (AFDC) Program.

Prior stages of the litigation have already been sufficiently described. *See* National Welfare Rights Organization v. Wyman, 304 F.Supp. 1346 (E.D.N.Y. 1969); Rosado v. Wyman, 304 F.Supp. 1350, 1354, 1356, (E.D.N.Y.), rev'd, 414 F.2d 170 (2d Cir. 1969), rev'd, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970). For our present purposes it is enough to point out that the United States Supreme Court held that on July 1, 1969 defendants implemented AFDC schedules which "impermissibly lowered [the] standard of need by eliminating items that were included prior to the enactment of § 402." Rosado v. Wyman, 397 U.S. 397, 416, 90 S.Ct. 1207, 1219, 25 L.Ed.2d 442 (1970).

The Supreme Court remanded the case to this Court to "review, taking into account the views of HEW [the Department of Health, Education and Welfare] should it care to offer its recommendations, any revised program adopted by the State, or, should New York choose not to submit a revamped program * * issue its order restraining the further use of federal monies." *Id.* at 421–422, 90 S.Ct. at 1222.

As a result of the litigation to date, it is apparent that since July 1969 New York has received hundreds of millions of dollars of federal money in violation

of federal law. The violation resulted in illegally reducing payments to recipients of AFDC aid by tens of millions of dollars.

Effective June 1, 1970 New York State's AFDC program was revised. Defendants contend that this current program satisfies the requirement of section 402.

For the reasons indicated below the State is still in error. It must either comply with federal law or stop taking federal aid.

## I. NEW YORK'S PRESENT AFDC PROGRAM

As in the past, the new State plan pays to AFDC recipients 100% of their need, as defined in the plan. In New York, therefore, the basic need schedule or standard of need serves two functions: It is a standard for determining eligibility to participate in the AFDC program and it represents the level of benefits that an AFDC recipient is to receive. The basic need schedules, effective June 1, 1970, are as follows (18 N.Y.C.R.R. 352.1 and 352.2):

### CURRENT BASIC NEED SCHEDULE

#### FAMILY SIZE

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | Ea. add. |
|---|---|---|---|---|---|---|---|---|
| SA–1 (New York City and seven suburban counties) | $84 | $134 | $179 | $231 | $284 | $329 | $374 | $45 |
| SA–2 (42 Northern counties) | $69 | $115 | $161 | $207 | $253 | $294 | $335 | $41 |
| SA–3 (8 Western counties) | $65 | $111 | $157 | $203 | $249 | $290 | $331 | $41 |

Generally, the payment received for basic needs by an AFDC recipient of given family size will not correspond exactly to the above schedule. Once it is determined that a family has a "budgetary deficit," i. e., its income is not equal to or greater than the need schedule, the eligible family only receives payments from the State to meet the budgetary deficit.

In addition to the current basic need schedule there are schedules for the cost of rent and heating fuel and a very few other items of need such as household moving expenses. 18 N.Y.C.R.R. § 352.-6(a). This new system results from a desirable consolidation of scores of special need items. See Rosado v. Wyman, 304 F.Supp. 1356, 1369 (E.D.N.Y.1969) for an explanation of the advantages of this new flat-grant system. The schedules in effect on July 1, 1969 had also embodied a flat-grant system but the Supreme Court found that, in promulgating those schedules, the State had impermissibly eliminated some special need items.

During the year prior to July 1, 1969 New York State's AFDC program complied with federal law. During that year, as well as currently, the levels of benefits were designed "to fully make up budgetary deficits as defined by its standards of need." Rosado v. Wyman, 304 F.Supp. 1356, 1365 (E.D.N.Y.), rev'd, 414 F.2d 170 (2d Cir. 1969), rev'd, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970). Posed is a simply stated question of fact: is the State's present standard of need lower than the one used in the base year, July 1, 1968 through June 30, 1969? Since the State has always claimed to pay 100% of its defined standard of need, the question can be rephrased to ask whether current payments under the schedules effective June 1, 1970 are no less than the amounts paid to like AFDC recipients in the base year. The simplicity of statement belies the difficulties encountered in making the required comparison.

## II. STANDARD OF NEED COMPELLED BY SECTION 402

### A. *General Guidelines*

The Supreme Court has decided that section 402 does not preclude a State from redefining its method of determining need. It may consolidate and simplify its standard of need by eliminating certain "special needs" supplied after individual request and authorization, and provide instead for meeting both special needs and basic needs out of a uniform allowance. But it must satisfy the fundamental requirment that "all factors in the old equation [be] accounted for." Rosado v. Wyman, 397 U.S. 397, 419, 90 S.Ct. 1207, 1221, 25 L.Ed.2d 442 (1970).

The obvious question is how New York State is to determine the amount to be included to meet the former special need items since by their very nature, they were provided to some but not all of the recipients with varying frequency and in varying combinations. To this the Supreme Court responded that the State might consolidate items on the basis of statistical averages—so long as this represented a fair averaging—and thereby arrive at a flat dollar amount for each family or person. *Id.*

### B. *Study*

At hearings conducted in June 1970 the defendants attempted to demonstrate that the revised schedules were in compliance with section 402 by showing the theory upon which the new schedules were devised. At that time HEW advised the Court that it could not—using materials supplied by the State—determine whether the revised AFDC schedules complied with section 402. The Court agreed with HEW's conclusion and ruled that defendants had not adequately justified the June 1, 1970 schedules. They had failed to demonstrate that the new schedules accounted for those items of special need eliminated on July 1, 1969 and not otherwise provided for under current regulations.

All parties, HEW and the Court agreed that since an AFDC recipient's need was determined much differently currently than in the base year no meaningful comparison could be made between need "schedules" for the two periods without further information. A comparison would have to be made, therefore, between current payments to individuals under the AFDC program and payments made to like individuals during the base year. The data, which was not then available but was required for any meaningful comparison between the base year and present payments, was the amount per recipient per month paid for "special need items" as defined in the AFDC program in effect during the base year. This data could not be obtained from a schedule because the special need items were individually tailored payments made upon individual application and verification. The problem was to convert these special need item payments—by their nature not uniform throughout the population—into a dollar value which would apply uniformly to all AFDC recipients for the base year. In

the case of special need items, need and payment coincided; therefore the value obtained could be used as a substitute for need.

Neither defendants nor any local social service district had retained full records with respect to special need payments made during the base year. There were not even skeletal records for any area of the State other than New York City. Within the City of New York the problem was compounded by changes since the base year in record-keeping techniques, and by lack of computer records for critical periods.

An added complication in making comparisons is that the base year itself was not stable. A number of substantial adjustments were made in the AFDC program during that year. For instance, some special need items apparently were absorbed into the basic need grant. See the discussion of laundry at p. 1185, infra. In New York City there was substituted for some special need payments a flat payment of $100 per recipient per year that became the New York City cyclical grant.

All concerned concurred in the decision that a statistical sampling of New York City caseload should be undertaken in order to ascertain the average value per recipient per month of special need items included in the need standard prior to July 1, 1969 and for which provision is not specifically made by current regulations. Accepting the suggestion of defendants, the Court ruled that the appropriate base period was July 1, 1968 through June 30, 1969. Defendants, plaintiffs and HEW agreed that the results obtained from this sample would be treated as the uniform result for the entire State.

The Court is, in a sense, comparing base year apples with current year pears. Much of the computation consists of converting the apples into pears—a task similar to that of historical recreations generally. See, e. g., H. Hughes, History as Art and as Science, 94 (1964) ("all history is contemporary in the sense that its presentation reflects the circumstances and attitudes of those who write it"). (emphasis in original). The Study is an attempt to construct a standard of need in the base year which is comparable to the current standard of need. In the process some almost arbitrary reconstructions must be made. For example, we have assumed that the basic grant for the base year was uniform over the twelve month period, although adjustments were made during the year. See, Rosado v. Wyman, 304 F.Supp. 1356, 1366 (E.D.N.Y.1969). We do not, however, treat the New York City cyclical grant as being in force except during the last ten months of the year, when it was actually in effect (see discussion of clothing and household furnishings and repairs, p. 1187, infra).

Sampling has long been considered an acceptable method of determining the characteristics of a large universe. The United States Decennial Census of 1970, for example, is relying on sample reports to determine information on income, work experience and earnings, and housing characteristics of the population of the United States. For inter-census years, a small sample of only 50,000 households is used to represent the total population.

Such mathematical and statistical methods are well recognized by the courts as reliable and acceptable in determining adjudicative facts. See, e. g., Jones v. Georgia, 389 U.S. 24, 88 S.Ct. 4, 19 L.Ed.2d 25 (1967) (finding of discrimination based entirely on jury selection statistics and absence of explanation); Hernandez v. Texas, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954) (same); Maxwell v. Bishop, 398 F.2d 138, 141–148 (8th Cir. 1968), rev'd on other grounds, 398 U.S. 262, 90 S.Ct. 1578, 26 L.Ed.2d 221 (1970) (racial discrimination in application of death penalty); Campbell v. Board of Education, 310 F.Supp. 94, 105 (E.D.N.Y.1970)

(election procedure); Gautreaux v. Chicago Housing Authority, 296 F.Supp. 907, 910–914 (N.D.Ill.1969) (housing discrimination); Zippo Manufacturing Co. v. Rogers Imports, Inc., 216 F.Supp. 670 (S.D.N.Y.1963) (unfair competition; sample of consumers); Iannucci v. Board of Supervisors, 20 N.Y.2d 244, 251, 282 N.Y.S.2d 502, 507, 229 N.E.2d 195, 198 (1967) (reapportionment); Coordinating Committee for Multiple Litigation, Manual for Complex and Multidistrict Litigation, 2.612 (1970) (citing considerable case authority); Barksdale, The Use of Survey Research Findings as Legal Evidence (1957); Hart & McNaughton, Evidence and Inference in the Law, in Hayden Colloquium on Scientific Concept and Method 54–55 (Lerner ed. 1958); Ball, The Moment of Truth: Probability Theory and Standards of Proof, 14 Vand.L.Rev. 807, 813 (1961); Banzhaf, Weighted Voting Doesn't Work: A Mathematical Analysis, 19 Rutgers L.Rev. 317 (1964); Finkelstein, The Application of Statistical Decision Theory to Jury Discrimination Cases, 80 Harv.L.Rev. 338 (1967); Finkelstein and Fairley, A Bayesian Approach to Identification Evidence, 83 Harv.L.Rev. 389, 516–17 (1970); Kaplan, Decision Theory and the Factfinding Process, 20 Stan.L.Rev. 1065 (1968); Kingston, Probability and Legal Proceedings, 57 J.Crim.L.C. & P.S. 93 (1966); Liddle, Mathematical and Statistical Probability, 51 Iowa L.Rev. 849 (1966); Zeisal, The Uniqueness of Survey Evidence, 45 Cornell L.Q. 322 (1960). It was a principle recommendation of the prestigious committee which wrote the Manual for Complex and Multidistrict Litigation that "[s]cientifically designed samples * * * meeting the tests of necessity and trustworthiness * * * [be used to] contribute materially to shortening the trial of the complex case." Manual for Complex and Multidistrict Litigation, *supra*, at 2.612.

Statisticians can tell us with some assurance what the reliability factors and probabilities are. Only the law can decide, as a matter of procedural and substantive policy, what probabilities will be required before the courts will change the status quo by granting a remedy. Thus, in deciding whether a sample is adequate, practical limits to fact finding precision must be considered. *See, e. g.*, Zippo Manufacturing Co. v. Rogers Imports Inc., 216 F.Supp. 670, 681 (S.D.N.Y.1963) (three samples of 500 each to cover all smokers in the country); Brown Shoe Co. v. United States, 370 U.S. 294, 340, n. 69, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). As Judge Feinberg pointed out in connection with the use of sampling techniques:

> "Necessity * * * requires a comparison of the probative value of the survey with the evidence, if any, which as a practical matter could be used if the survey were excluded." Zippo Manufacturing Co. v. Rogers Imports, Inc., 216 F.Supp. 670, 683 (S.D.N.Y. 1963).

In the instant case where the question of the value of special needs arose after the fact, the State did not have adequate retained information or data at hand from which it could determine the amount of special need grants made during the relevant period, nor could any such information be readily produced. The only source of such information was a review of the individual case records of AFDC families. It was entirely impracticable to review all the case records. The monthly average number of cases in New York City from July 1968 through June 1969 was 186,629. Accordingly, a sample of such cases was the only feasible technique.

Two independently and randomly selected one percent samples of the "families" in New York City which received AFDC assistance during the base year were selected. Of the original 5,344 cases in the sample, sufficient information could be located for 3,343 cases. Though small, the State's and HEW's statisticians seem reasonably assured

that the sample is a valid reflection of the universe.

Findings from the cases studied would be more representative had it been practicable to locate all the 5,344 records whose numbers had been drawn. In the short time available, and in the light of available resources, this was not possible. The statistics show that for the examined cases the average size of the recipient group and the average monthly payment are very close to these averages for the total caseload, thus indicating that the sample closely resembles the population. This conclusion is strengthened by data which shows that the distribution of recipient groups by size of group was sufficiently similar in the sample and in the population so that the sample cases could properly be considered, within accepted statistical confidence limits, as a fair random selection from the population.

For the sample observations derived from the 3,343 cases, the chances are better than 95 out of 100 that the average outlay per month for 20 special needs per person in the universe would lie in a range of ± $.15 about the figure of $.94 obtained from the sample, that is between $.79 and $1.09. The comparable ranges for the average needs for each family size are (according to HEW):

1. $1.47 ± .46
2. 2.74 ± .24
3. 2.71 ± .19
4. 3.57 ± .30
5. 4.17 ± .46
6. 6.10 ± .62
   or more

HEW, as amicus curiae, examined these statistics on the basis of the procedures outlined for the Study and field observations by its own staff. It found the Study results an acceptable indicator of what actually took place during the base year.

The Court recognizes that extrapolating to arrive at precise dollar figures for families of different sizes in various areas of the State, particularly where the sample is so small, presents opportunities for discrepancies and errors. There is, for example, little hard factual data before us to support a critical hypothesis that upstate "families" received special grants at the same rate as New York City "families." Nevertheless, the practical fact finding problems facing the Court require risks to be taken. The probability of injustice by failing to act or by delaying action to await more definitive studies is far greater than the probability of injustice by acting on the best obtainable incomplete data.

The results of the Study for each special need item may be thought of as an indication of average payment. A reasonable average value for each person or family in a group—in which it is admitted that not all have an equal need for each specific component—is obtained so long as the total amount of the payment for each item corresponds to the extent of the need for that item in the total caseload. This Court finds that the figures of average grants produced from the Study represent a fair averaging even though they involve rounding off, sample error, and other obstacles to precision. They are the basis of most of the calculations in this memorandum.

The State's contention that present AFDC need schedules in area SA–1 comply with section 402—that is, are at least equal to the need schedules in effect during the base year—is summarized in the following chart:

Comparison of Current Monthly Allowances with Average Monthly Allowances for Items of Basic Needs and 15 Selected Special Needs during the Year Prior to July 1, 1969 for ADC Cases in SA-1 Area

Number of Persons in Assistance Group

[A3326]

In making the transition from the raw data to this chart many judgments have been made about the composition of the standard of need in the base year. Several of these decisions are disputed.

C. *Disputed Facts About Contents of Standard of Need During Base Year*

There are three matters in dispute with respect to the base year figures

They are the number of special need items to be included, the amount of the grant for clothing and household furnishings and repairs, and the method of computing the basic monthly grant. HEW, as amicus curiae, has submitted a very helpful brief dealing specifically with these controversies. In each instance where HEW has expressed an opinion the Court has concurred in its expert judgment.

The effect of the positions of the parties and HEW are summarized in the following table.

### SUMMARY OF CONTENTIONS RESPECTING MONTHLY ALLOWANCES IN SA–1

| Family Size | | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|---|
| Base Year | (Plaintiffs | 79 | 131 | 185 | 234 | 293 | 324 |
| | (Defendants | 70 | 122 | 175 | 223 | 280 | 310 |
| | (HEW | 72 | 126 | 179 | 228 | 285 | 317 |
| Present | | 84 | ⁻134 | 179 | 231 | 284 | 329 |

#### (1) *Disputed Special Need Items*

The State agrees that at least 15 of the former special need items must be accommodated within the current need schedules. These are Code 04, Clothing-camp and institutional; Code 72, Diet, special; Code 13, Employment, expenses for securing; Code 75, Household supplies; Code 26 Telephone service (including installation); Code 92, Transportation-school; Code 94, Transportation-day center visit; Code 95, Transportation-seek employment; Code 93, Transportation-visit relative; Code 16, Transportation-outside New York City (exclusive of Removals); Code 91, Transportation-other; Code 76, Utility-electricity; Code 79, Utility-hot water fuel; Code 80, Utility-cooking fuel; Code 99, Other.

Plaintiffs argue that ten additional items need to be accounted for: Code 71, Add-on for an additional adult; Code 82, Handicap allowance; Code 24, Guide Fees; Code 29, School expenses; Code 83, Diaper service; Code 02, Laundry; Code 14, Replacement of cash, lost or stolen; Code 08, Replacement for check not received by recipient which is negotiated and cancelled; Code 43, Rent, accrued; and Code 44, Utilities, accrued.

(a) *Add-on for an additional adult.* The State's position is that Bureau of Labor Statistics (BLS) information, indicates that in families of the same size a two-adult family has a lower living cost than a one-adult family. Defendants are unable to demonstrate that use of the BLS equivalence scale has validity without application of the total BLS schedule with all its components. They also have given no assurance that BLS figures would indicate the same relative difference in living costs if consideration were limited to the items of need provided for in the current New York AFDC standard. In addition, BLS studies as to family requirements presuppose a family with an existing inventory of goods, and allow only for maintenance and normal replacement of these items, which is not the usual situation for an AFDC family.

In any event, the argument over the impact of the BLS equivalence scale is beside the point. The add-on amount for the additional adult was included in New York's allowances for basic needs in 1968–69. The State standard

itself thus indicated a finding of a need for an additional grant in two-adult families. The question now is not whether such a need should have been recognized in the base year, but whether the extent to which it was recognized has been adequately carried over to the present.

This item may be viewed alternatively as a recognition of a special need or as an adjustment to the basic allowance when two adults were included in the family. Under either approach, considering the reasons given by the State and the former use in determining the amount of the assistance payment, there does not appear to be any basis for omitting it from current consideration. The State may eliminate the separate provision and average it into the flat grant along with the other special need items, but it may not omit the add-on for an additional adult from the present grant.

(b) *Handicap allowance, guide fees, and school expenses.* The State has not suggested that there is any less need than there was in 1968 for handicap allowances, guide fees and school expenses or that the cost is being provided to AFDC recipients in any other way. Accordingly, since they were formerly included in determining the amount of the assistance payment, there is no apparent reason for exclusion of handicap allowances, guide fees and school expenses from current consideration.

(c) *Diaper service.* Defendants argue that payments for diaper service were "mistakenly" continued in New York City "although not specifically authorized under Department policy." There is reliance upon the discontinuance of the laundry special need item concurrently with the inclusion of laundry in the basic schedule in August 1968. Under the system used by New York City, however, the special allowance for diaper service and the general laundry special allowance were separate. There is no convincing evidence that diaper service was considered in making up the basic grant (and in this respect the treatment differed from that for laundry considered below). Furthermore, the State has not indicated that the continuance of the diaper service special need item after August 1968 was incorrect, but only that it was not specifically authorized.

While the question of reimbursement is not controlling, it appears that during the base year no question was ever raised as to inclusion of these expenditures in the amount of assistance granted for which State and Federal reimbursement was claimed. If, as the State now asserts, these payments were not included under its AFDC plan, federal financial participation was incorrectly claimed, and adjustment would have to be made. It seems reasonable to assume, in view of the confusion as to coverage of this item under New York's regulations and the actual practice as revealed in the Study, that the State recognized the cost of diaper service as a special need item. Thus, it was a factor in determining the amount of the AFDC payment that must be accounted for in the current basic allowance.

Affidavits submitted by defendants fairly demonstrate that diaper service was recognized as a basis for a special grant almost exclusively in the SA–1 area. The State argues from this that, even if it must be accounted for in current SA–1 schedules, it should not be added to SA–2 and SA–3 schedules. The difficulty with that position is that it is contrary to the stipulation that Study figures on special needs should apply state-wide. Were we to permit the State to show discrepancies of this type, plaintiffs would then be free to introduce proof about special needs that were recognized upstate but not in the City of New York and the litigation might go on interminably.

(d) *Laundry.* The State did revise the statement of the basic need grant in August 1968 to indicate that the special need for laundry had been incorporated. Apparently the State inadvertently failed to rescind the regulatory provision

authorizing this special need item. As a result of this failure by the State, or for some other reason, New York City apparently continued to make some grants for this purpose.

Nevertheless, as the State points out, the special need item for laundry—unlike the diaper service discussed above—duplicated an item which was considered in arriving at the amount of the standard allowances for basic needs. The AFDC basic need schedules were promulgated as of August 31, 1968, but for purposes of the computation of the standard of need they are assumed to have been in effect from July 1, 1968. Most of the expenditures for laundry as a special need item were incurred in the months of July, August and September 1968, before the adjusted basic need schedules took hold; to count these amounts would be duplicative and inconsistent with our assumption that the same basic need schedules were in effect for the entire year under study. Supporting the conclusion that laundry had been deleted as a special need item and included in an acceptable way in the allowance for basic need is the fact that relatively small amounts were paid for this purpose after September 1968, and these amounts diminished as the year went on. This item, then, was in the base year provision for basic need and need not be accounted for again.

(e) *Replacement for cash, lost or stolen or for check not received; accrued rent and accrued utilities.* The remaining four items are all of a replacement nature—replacement for a lost but nonetheless cancelled check or for the lost or stolen receipts of an assistance check; and payments for rent and utilities bills incurred after the family began to receive assistance and not met out of the assistance payments computed to meet such needs, that is, a replacement for the amounts previously provided for such purpose. HEW and the State do not consider that such amounts represent a part of the yardstick used in the base year to determine the amount of the assistance payment to which an individual

or family was entitled. The State's standard for this purpose is based on the cost of the items required for daily living as defined in the standard. When a replacement is received for money previously paid, either because a client has lost it or because he has used it for another purpose, there is no determination that he has a need for items over and above those in the standard. There has been only an acceptance of the fact that the money originally intended to be available for application for that need has not served its purpose. This is apparent in the case of lost money or checks. The assumption on which a new payment is based is that the recipient will not have any greater sum available to meet his needs than the amount he was determined to require under the assistance standard. Thus, the standard of need is unaffected.

The Court recognizes the force of counterarguments on this point. In a sense such catastrophic events as loss of money through theft or otherwise is a cost to the population of welfare families as a whole. The Court takes judicial notice of the many cases of stolen checks in the Eastern District showing how widespread is the preying of drug addicts and other criminals on the poverty stricken in this state. For the more affluent members of society such costs are averaged over a large part of the population through insurance premiums; and, it can be argued, the averaging reflected in the new State schedules is an appropriate means for averaging this cost across the entire AFDC population.

The Department of Health, Education and Welfare approves the State's failure to include these items. Where "there is real doubt as to how the Department's standards" or relevant AFDC legislation "apply to the particular state regulation or program," a district court is entitled to rely heavily on HEW's expertise. Rosado v. Wyman, 397 U.S. 397, 407, 90 S. Ct. 1207, 1215, 25 L.Ed.2d 442 (1970). We yield to the special expertise of HEW and its knowledge of national welfare practice. The State need not include

replacement for lost or stolen cash and for a check not received in its present standard of need.

The payment for accrued rent and utilities admittedly increases the money recipients have available to them. As in the case of lost or stolen checks accrued rent and utility costs would be considered a "current need" of most self-supporting members of the community. However, so much of the treatment of needs of AFDC recipients is artificial, so much responds not to real world criteria but to bureaucratic symbolism, that the Court is reluctant to apply unalloyed common sense. HEW has advised this Court that it believes these items are not an addition to the standard of need. There is arguable merit in this position since such payments are of a non-recurrent and emergency nature designed to rectify a prior difficulty rather than to meet a current need. The HEW view is therefore accepted; the cost of the rent or utilities factor in the standard is not increased through accruals. Accordingly, this Court, again relying on the expert knowledge of HEW, does not consider these payments to have been factors in the determination of need or the amount of the assistance payment from July 1, 1968 through June 30, 1969. They need not be included in the current standard of need.

(2) *Special allowance for clothing and household furnishings and repair.*

In order to better understand the controversy over special allowances for clothing, furnishings and repair, some background is necessary. All concerned agree that the cost of these items was a factor in determining the amount of the assistance payment in the base year. They must be accounted for in the current allowance since separate provision for them is no longer made.

What is at issue is the method by which average cost is to be determined. Under a demonstration project approved by HEW on August 15, 1968 pursuant to section 1115 of the Social Security Act (42 U.S.C.A. § 1315), New York City was authorized to utilize a method of providing for these need items in a way different from the statewide method provided for in the State plan. Whereas the State plan required that grants for these purposes be made on individual application and verification, the "Simplified Payment System" project established in New York City provided for making a series of quarterly "cyclical grants" to all persons to cover these needs. The main purpose of the project was to determine whether cyclical grants would provide more uniformity and greater equity in distribution of special need funds among the total caseload.

In July and August payments to New York City recipients for these special clothing and household need items had been made on the statewide special need grant basis. Cyclical payments began in September 1968, the first payment being a pro-rated amount to cover the last month of the July through September quarter. Thereafter cyclical grant payments were made in the first month of the quarter.

In computing the base year need standard, the State has provided for the cost of the special allowances for clothing and household furnishings and repair on the basis of the allowance in the cyclical grant of $8.33 per month per person. Plaintiffs contend that the actual payments made in July and August for these special need items should be averaged with the cyclical payments made in succeeding months to arrive at the following values:

| Family Size | | | | |
|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 |
| $9.85 | $18.88 | $27.46 | $36.11 | $44.10 |

(HEW's computations, based upon the same theory are, respectively, $9.76, $18.80, $27.46, $36.13 and $44.12.)

At the time the project was submitted and approved, there was no specific verification of the method by which the amount of the cyclical grant had been determined. It was then the view of the parties to the project that the amount fixed bore a reasonable relationship to

what might be expected to be the true value or cost of these items to the caseload as a whole and the accuracy of this judgment was to be tested in part by the project itself.

The data relating to payments made for these grants in July and August 1968 confirm that the average payment per person for this period was significantly higher than $8.33 per month. Accordingly, in view of this fact and the fundamental premise underlying use of the study, namely, that a tabulation and averaging of actual payments during the entire base year would produce a fair estimate of the value of the items, the allowance for clothing and household furnishings and repair must be based upon an averaging of the special need grants made in July and August of 1968 and the subsequent cyclical grants. This is also the view of HEW.

### (3) Computation of Basic Need Grant in Base Year

■ Finally, there is a dispute over the value of the basic monthly grant to which the items of special need must be added in order to compute the complete need schedule as it existed in the base year. Defendants allege that the basic monthly grant should be $60.55 for a one person household, $104.29 for two, $148.-93 for three, $187.93 for four, $236.44 for five, and $308.49 for families of six or more. Plaintiffs contend the amounts should be $66, $107, $152, $191, $240 and $312, respectively.

It is not disputed that during the base year there was in effect a "basic need grant" to which was added the payments for "special need items" and, once it became effective, the cyclical grant. Nor is it disputed that it is this sum which constituted the "standard of need" during the base year. There were, however, four different basic need grants in effect in the State. Basic need grant Schedules SA-1, SA-2, and SA-3 covered the same geographical area as present schedules SA-1, SA-2 and SA-3, although their content was different. In addition, Schedule SA-4, in effect statewide, in-

cluded the same items which made up the basic need grants SA-1, SA-2 and SA-3 except utilities. Grants were computed on this basis where a family's need for utilities was met through the shelter allowance because the rent included the cost of utilities or for some other reason the family had no shelter or utilities costs.

As a result of the Study, the State determined the percentage of families in New York City which did not receive the SA-1 allowance but rather had their grants computed on the basis of SA-4. It proposes to use a weighted average of the SA-1 and SA-4 schedules to represent the cost of the basic need grants.

Plaintiffs argue that this approach gives inadequate effect to the need for utilities. Utilities were included in the definition of items of basic maintenance as of August 1968. § 352.4(a) of the State's Regulations as promulgated August 31, 1968. (In fact, the State's three dollar differential in schedules SA-1, SA-2 and SA-3 prior to July 1969 was attributed solely to differences in costs of utilities.) Since the SA-4 schedule omitted utilities, plaintiffs argue that the value of utilities in 1968 can be reflected today only through use of the SA-1, SA-2 and SA-3 schedules which included this item.

From another perspective, however, the averaging of the SA-4 schedule with the SA-1 schedule and the other two schedules as well merely does for the basic need grant items what the Study was originally intended to do only for the special need items. Thus, setting aside shelter and special need items, which are otherwise accounted for, we must determine the average value of the 1968 allowance for basic need. Just as the former breakdowns by age of oldest child have been reduced to a single figure for a family of a given size, so the formerly separate SA-1 and SA-4 schedules are telescoped into one.

Some individuals formerly did not need provision for utilities through the basic grant allowance, and they were paid under the SA-4 schedule. By the

averaging of the schedules, they are in theory advantaged and those formerly paid under the SA–1 schedule are disadvantaged. But this is essentially no different than the averaging of special need items. The one with greater need now gets less, and vice versa. In the special need situation, the majority receives a small gain as the result of averaging, and the minority (who had the special need) suffer a relatively large loss. In the basic needs situation, it is the majority who lose, and the minority who gain. But the principle and the process of averaging are the same.

The State did not previously propose to average the basic need schedules, but only because it lacked the necessary data to support a fair averaging. Use of an average figure which, *inter alia,* covers utilities means that the current allowance for shelter has a somewhat different function than previously. If a family's rent also covers some or all of its utilities costs, this is not now considered to reduce or eliminate its utilities need, which is included in the averaged basic amount. Rather, the family has made a good buy in shelter, just as when for the same money it gets an apartment with a washing machine, a plot to grow vegetables or a lower cost of transportation.

The Court concurs with HEW's view that it is proper to average both the basic and the special need grants.

## III. REQUIRED STANDARD OF NEED IN SA–1 AREA

On the basis of the conclusion reached thus far, the following monthly amounts represent the standard of need in effect during the base year in New York City.

| Family size | Weighted average SA–1 and SA–4 | 20 special need items | Clothing Furnishings and Repairs | Total Base Year SA–1 | Current SA–1 Allowance |
|---|---|---|---|---|---|
| 1 | $ 60.55 | $1.47 | $ 9.76 | $ 71.78 | $ 84 |
| 2 | 104.29 | 2.74 | 18.89 | 125.92 | 134 |
| 3 | 148.93 | 2.71 | 27.46 | 179.10 | 179 |
| 4 | 187.93 | 3.57 | 36.13 | 227.63 | 231 |
| 5 | 236.44 | 4.17 | 44.12 | 284.73 | 284 |
| 6 | 257.59 | 5.09 | 53.80 | 316.48 | 329 |
| 7 | 308.91 | 4.66 | 62.99 | 376.56 | 374 |
| 8 | 337.48 | 8.95 | 68.07 | 414.50 | 419 |

The result of the addition of the values for all the factors included in the standard of need for the base year results in a slightly higher figure for families with three, five and seven members than the standard currently applicable in the SA–1 area to such groups. The excess in each case is well below one percent.

Such a difference cannot be considered significant since the values obtained for the items included in the standard of need for the base year represent the findings of a statistical sampling where the margin of error is in itself in the order of one percent. Furthermore, the fair averaging envisaged by the Supreme Court may be judged on the basis of the entire standard. We must not forget the Supreme Court's ruling:

"Providing all factors in the old equation are accounted for and fairly priced and providing the consolidation on a statistical basis reflects a fair averaging, a State may, of course, consistently with § 402 redefine its method for determining need." Rosado v. Wyman, 397 U.S. 397, 419, 90 S.Ct. 1207, 1221, 25 L.Ed.2d 442 (1970).

It is for this reason that the Court does not view the payments in excess of federal requirements to certain family sizes as meaning that payments are unrelated to need.

In its brief HEW advised this Court: "[b]ased on the policies previously followed in the evaluation of State standards, HEW would find from the above that the State has made a sufficient showing as to an allowance for all factors of needs as of 1968 prices in the standard applicable in New York City to remove any question of compliance with § 402(a) (23)."

As HEW noted in its brief, a far different question would be raised if the figures produced by the study substantially exceeded the current standard as to all or even most of the family groups. In that case the pattern of consistent underevaluation would contradict a finding that the standard fairly reflected the value of all the factors included in the base year. The incidence of variation in the City of New York does not offer a sufficient basis on which to displace the judgment of the State agen-

cy primarily responsible for allocating limited welfare resources among different size families. The current SA–1 schedules comply with federal law.

## IV. REQUIRED STANDARD OF NEED IN SA–2 AND SA–3 AREAS

A. *Preliminary Findings and Injunction*

On September 16, 1970 this Court issued a preliminary injunction based on its tentative finding that New York was violating the law in upstate areas by paying AFDC recipients less than is required by section 402. It ordered:

During the pendency of this action and so long as New York purports to pay 100% of need as the level of Aid for Dependent Children (AFDC), defendants, their successors in office, agents and employees are enjoined from drawing on or using federal funds in the AFDC program after October 31, 1970 so long as payments on schedules SA–2 and SA–3 as of October 1, 1970 are lower than the following:

### FAMILY SIZE

|      | 1  | 2   | 3   | 4   | 5   | 6   | 7   | 8   | 9   | Ea. Add. |
|------|----|-----|-----|-----|-----|-----|-----|-----|-----|----------|
| SA–2 | 68 | 121 | 172 | 221 | 277 | 307 | 366 | 407 | 442 | 41       |
| SA–3 | 67 | 118 | 170 | 218 | 274 | 305 | 363 | 404 | 439 | 41       |

The computations were based upon concessions of the State. Nothing in the proceedings subsequent to that order has altered the basic judgment of the Court, although the resolution of the conflicts with regard to the standard of need during the base year requires that the payment figures contained in the Court's order for Schedules SA–2 and SA–3 areas be slightly increased.

B. *Class Includes Recipients in SA–2 and SA–3 Areas*

Defendants object that this Court cannot make the injunction permanent because it has no jurisdiction to review the payment schedules of New York's AFDC program in any area other than that covered by Schedule SA–1. This contention is based on the fact that no named plaintiff resides in an SA–2 or SA–3 area.

■ This suit was instituted by plaintiffs as a class action and extends to all "members of the class" wherever located. The class nature of this suit has never been seriously questioned by defendants. Plaintiffs, defendants, HEW, this Court, the Court of Appeals, and the United States Supreme Court have all treated this litigation as being statewide in its ambit. For over a year, while the case worked its way up and down the federal judicial hierarchy, defendants never challenged the statewide scope of the class.

In their original complaint the plaintiffs sued

> "on their own behalf and on behalf of *all New York* individuals and families similarly aggrieved by the unlawful reduction of public assistance grants pursuant to Section 131-a of the New York Social Services Law in violation of the Social Security Act and federal regulations." Complaint, p. 12 (emphasis in original).

The gravamen of the complaint, which was sustained by the Supreme Court, was that section 131-a constituted a reduction in the content of the standard of need in that special grants *"available throughout the State"* were eliminated by that statute. Complaint, p. 16 (emphasis in original).

Very early in the litigation, in urging this Court to convene a three judge court to hear plaintiffs' equal protection claim, counsel for defendants argued that "it's fantastic to say all of a sudden that this [the equal protection claim] only applies to Nassau County and New York City and it is not statewide. 131-a is a statewide statute * * *. *The impact of this statute is statewide and the impact of an assault on this statute is statewide.*" Transcript, April 18, 1969, pp. 102, 104 (emphasis added). This Court's opinion granting summary judgment to plaintiffs included findings of fact as to the effect of section 131-a statewide. Rosado v. Wyman, 304 F.Supp. 1356,

1381, 1383 (E.D.N.Y.), rev'd, 414 F.2d 170 (2d Cir. 1969), rev'd, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970). The permanent injunction entered by this Court on June 18, 1969 was not limited to New York City and Nassau County. The application of section 131-a was enjoined throughout the State; specific reference was made in that order to "special grants throughout the State."

It is apparent that when this case was presented to the Supreme Court, New York's statewide AFDC plan was at issue. That Court reviewed the entire New York program and concluded "[w]hat is at the heart of this dispute is the elimination of special grants in *the New York program.*" Rosado v. Wyman, 397 U.S. 397, 419, 90 S.Ct. 1207, 1221 (1970) (emphasis added). In holding that the New York program was "incompatible" with section 402, the Supreme Court found plaintiffs to be "entitled to declaratory relief and an appropriate injunction by the District Court against the payment of federal monies according to the new schedules, should the State not develop a conforming plan within a reasonable period of time." *Id.* at 419, 90 S.Ct. at 1222. Use of the plural "schedules" as well as the whole tenor of the remand indicates that this Court's power is not restricted to a review of the schedule applicable to the SA-1 area.

■ There is no propinquity requirement in Rule 23. Conceivably, the fact that a class is widespread geographically and the named plaintiffs are from a very limited segment of the class might bear on their ability to adequately represent the class, but it certainly has nothing to do with the Court's jurisdiction to entertain relief with respect to matters which affect the class. In several cases named plaintiffs from only a small part of the class have been allowed to represent geographically dispersed members of the class. *See* Eisen v. Carlisle & Jacquelin, 391 F.2d 555, 562–563 (2d Cir. 1968) (one odd-lot investor representing all odd-lot investors trading on the New

York Stock Exchange throughout the United States); Philadelphia Elec. Co. v. Anaconda American Brass Co., 43 F.R.D. 452, 462 (E.D.Pa.1968) (nine cities representing all cities in the United States with a population exceeding 50,000 as of the 1960 census); Siegel v. Chicken Delight, Inc., 271 F.Supp. 722, 724 (N.D.Calif.1967) (five northern California franchisees representing all franchisees throughout the United States).

■ It would be hard to visualize a Rule 23 case more appropriate than this one for resolution on a statewide basis. The validity of the statewide plan is at stake. If it is struck down in any of its parts then no money can be received from the federal government for New York's AFDC program. Any decision to require a change in the State's standard of need in any part of the State will affect the expenditures of the State and the State may meet its budgetary problem by reducing the percentage of payment to less than 100% of its standard of need; a percentage reduction would have to be uniform across the State and thus would affect every recipient of AFDC aid in the State.

With one arguable exception, every element of the requirement of a Rule 23 class action is certainly present. The class is numerous (Rule 23(a) (1)); there are common questions of law (Rule 23(a) (2)); the prosecution of separate actions by individual members of the class would create a risk of varying adjudications and would establish incompatible standards of conduct for the State (Rule 23(b) (1) (A)); adjudication with respect to individual members of the class would as a practical matter be dispositive of the interests of the other members not parties to the adjudication and would substantially impair their ability to protect their interests (Rule 23(b) (1) (B)); the State has refused to act on grounds generally applicable to the class thereby making appropriate final injunctive relief (Rule 23(b) (2)); and

questions of law or fact common to the class predominate over any questions affecting individual members and a class action is superior to all other available methods for the fair and efficient adjudication of the controversy (Rule 23(b) (3)).

The only possible question is whether the representative parties have fairly and adequately protected the interests of the whole class (Rule 23(a) (4)) and whether the claims of the representative parties residing in the area covered by SA–1 are typical of the claims of the class including those members of the class residing in areas covered by SA–2 and SA–3 (Rule 23(a) (3)). As for fair and adequate representation, there can hardly be any doubt that the attorneys for the plaintiffs have pressed this case with the highest degree of professional skill, vigor and fairness to all the members of the entire class (Rule 23(a) (4)). The result favoring SA–2 and SA–3 area recipients proves this beyond peradventure.

The State's claim in essence seems to be that the claims and defenses of the representative parties residing in the SA–1 area are different from those of the class residing upstate (Rule 23(a) (3)). It is interesting to note that no SA–2 or SA–3 members of the class make this claim. Rather it is the defendants who assert it in order to deprive SA–2 and SA–3 recipients of the very substantial fiscal gains they achieve by this Court's order. Moreover, the very concession of the State that the Study covering cases in SA–1 areas should be applied to SA–2 and SA–3 areas suggests that the claims of the former are, in the words of Rule 23(a) (3), "typical of the claims" of the latter.

The bona fides of the defendants in this matter are naturally suspect. But there is some glimmer of validity to the State's point that the City and upstate welfare recipients may find their claims in conflict. If the conclusion of this Court is correct that the upstate recipients are entitled to a higher schedule

while the City residents are entitled to the schedule they now have, it is possible for the State to meet its budgetary needs by reducing payments across the State on a percentage basis. The result would be an increase to upstate recipients and a decrease to City recipients.

■ Development of Rule 23 suggests that the typical representative element in Rule 23(a) (3) is designed to buttress the fair representation requirement in Rule 23(a) (4). The theory is that if the claims and defenses are typical then there will be every reason for the representatives to support their own claims and so advance the claims of others in a like position. The phrase in original Rule 23, "one or more, as will fairly insure the adequate representation of all," was expanded into clauses (3) and (4) of new Rule 23(a) when it was amended in 1966. But, as Professor Moore points out, in this respect the revised subdivision "does not differ materially from that part of the original." 3B Moore, Federal Practice ¶ 23.02–3. Professor Moore goes on to indicate that "there is no need for" the requirement of a typical claim in (a) (3) since it duplicates other requirements of Rule 23. *Id.* at ¶ 23.06–2. *Cf.* Eisen v. Carlisle & Jacquelin, 391 F.2d 555, 562–563 (2d Cir. 1968); Dolgow v. Anderson, 43 F.R. D. 472, 494–495 (E.D.N.Y.1968); Mersay v. First Republic Corporation of America, 43 F.R.D. 465, 468–469 (S.D.N. Y. 1968).

■ There is no antagonistic interest here in the sense of Hansberry v. Lee, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940). In that case one group desired to uphold a restrictive covenant and it could not, of course, represent those who wished to void it. In this case the intent of the representative parties was to raise all AFDC payments throughout the State. The fact that they succeeded in raising the floor sufficiently to aid only upstate recipients does not create an adverse or antagonistic interest between upstate and downstate plaintiffs. *Cf.*

Norwalk CORE v. Norwalk Redevelopment Agency, 395 F.2d 920, 937 (2d Cir. 1968); Eisen v. Carlisle & Jacquelin, 391 F.2d 555, 563 (2d Cir. 1968); Dawson v. Delaney, 189 F.Supp. 416, 419 (D.Del. 1960); Philadelphia Elec. Co. v. Anaconda American Brass Co., 43 F.R.D. 452, 463 (E.D.Pa.1968). *See also* Kaplan, 1966 Amendments of the Federal Rules of Civil Procedure, 81 Harv.L.Rev. 356, 379–380 (1967).

■ This case has been widely noted in the press. *See, e. g.,* National Institute for Education in Law and Poverty, 3 Clearinghouse Review 54 (1969); *Id.* at 82; *Id.* at 321. There are many legal offices upstate devoted to protecting welfare clients and other poor. Any of them could have, if they were so advised, intervened in this action at any time. That they have not done so suggests that they believe that the plaintiffs' attorneys were properly carrying forward the suit. Silence with knowledge has considerable significance in a case of possible conflict. *Cf.* Snyder v. Board of Trustees of University of Ill., 286 F.Supp. 927, 931, 937 (N.D.Ill.1968). As Henry S. Drinker has pointed out:

> "When the interest of clients diverge and become antagonistic, their lawyer must be absolutely impartial between them, which, *unless they* both or *all desire him to represent them* both or all, usually means that he may represent none of them." H. S. Drinker, Legal Ethics, 112 (1953) (emphasis added).

■ The matter of possible conflicts among clients raises the most subtle and sophisticated problems of legal ethics and judicial administration. *See, e. g.,* Code of Professional Responsibility, EC 5–15, n. 18; EC 5–16 (effective for ABA Jan. 1, 1970); *cf. Id.* DR 2–104(A) (5) (solicitation of client in class action). In any substantial class action there is always the possibility that some members of the class will take a position different from that of those who have

assumed the laboring oar in a litigation. But such differences of opinion do not preclude a class action. Eisen v. Carlisle & Jacquelin, 391 F.2d 555, 563 n. 7 (2d Cir. 1968). To some degree, as to some class actions, the matter is handled by permitting individual members of the class to be excluded (Rule 23(c) (2)). Siegel v. Chicken Delight, Inc., 271 F. Supp. 722, 727–728 (N.D.Calif. 1967). In a case such as we have before us such exclusion is obviously impossible since the State's regulations must stand or fall as a whole.

▮ In the new kinds of litigations we now have where the individual client's interest, as reflected in his payment for counsel, no longer is an appreciable factor in a decision to sue, to join others or to conduct the litigation, new ethical problems can be expected to arise. Rosenberg et al., Elements of Civil Procedure, 23–25 (1970). Their nature may change but they certainly do not disappear when the lawyer's altruism and desire to improve society rather than his desire to aid the individual client who has retained him motivates his decisions. Cahn and Cahn, Power to the People or the Profession?— The Public Interest in Public Interest Law, 79 Yale L.J. 1005, 1008 (1970) ("moral implications of a group of independent lawyers free to choose their own version of the public interest"). In the instant case it is clear that no ethical issue rises to the level requiring the Court to take any judicial action which would affect the nature of the class.

*See* Note, Sanctions for Attorney's Representation of Conflicting Interests, 57 Colum.L.Rev. 994 (1957). Plaintiffs' attorneys appear to have acted in accordance with the highest ethical traditions of the Bar.

▮ The State's position, based upon a possible conflict of interest as a reason for eliminating SA–2 and SA–3 areas from the class must be rejected. Rule 23, authority, common sense and the mandate from the Supreme Court make it clear that this Court has authority to review the newly formulated SA–2 and SA–3 schedules and to enjoin the use of federal monies by the State in its AFDC program if the SA–2 and SA–3 schedules do not comply with section 402.

C. *Application of Study to SA–2 and SA–3 Areas*

The parties have agreed that the figures obtained from the City of New York cases during the base period must be extrapolated to cover areas controlled by SA–2 and SA–3. For purposes of the preliminary injunction the Court accepted all of the State's contentions with respect to the special need items which should be included for the base year and all of the other contentions made by the State with respect to other calculations. After trial several of the contentions of the State with regard to the calculation of the standard of need during the base year have been rejected in favor of the plaintiffs' contentions. The modified computations are shown in the table set out below.

## SA–2

| Family Size | Weighted Average SA–2, SA–3 and SA–4 | 20 special need items | Clothing Furnishings and Repairs | Total Base Year | Current SA–2 Allowance |
|---|---|---|---|---|---|
| 1 | $ 58.91 | $1.47 | $ 9.76 | $ 70.14 | $ 69.00 |
| 2 | 102.78 | 2.74 | 18.89 | 124.41 | 115.00 |
| 3 | 145.81 | 2.71 | 27.46 | 175.98 | 161.00 |
| 4 | 185.59 | 3.57 | 36.13 | 225.29 | 207.00 |
| 5 | 233.33 | 4.17 | 44.12 | 281.62 | 253.00 |
| 6 | 254.69 | 5.09 | 53.80 | 313.58 | 294.00 |
| 7 | 306.04 | 4.66 | 62.99 | 373.69 | 335.00 |
| 8 | 334.71 | 8.95 | 68.07 | 411.73 | 376.00 |
| 9 | 363.46 | 6.32 | 77.80 | 447.58 | 417.00 |

## SA–3

| | | | | | |
|---|---|---|---|---|---|
| 1 | 57.27 | 1.47 | 9.76 | 68.50 | 65.00 |
| 2 | 100.52 | 2.74 | 18.89 | 122.15 | 111.00 |
| 3 | 144.25 | 2.71 | 27.46 | 174.42 | 157.00 |
| 4 | 183.24 | 3.57 | 36.13 | 222.94 | 203.00 |
| 5 | 231.00 | 4.17 | 44.12 | 279.29 | 249.00 |
| 6 | 252.52 | 5.09 | 53.80 | 311.41 | 290.00 |
| 7 | 303.17 | 4.66 | 62.99 | 370.82 | 331.00 |
| 8 | 331.93 | 8.95 | 68.07 | 408.95 | 372.00 |
| 9 | 360.67 | 6.32 | 77.80 | 444.79 | 413.00 |

■ As a result of these modifications the current AFDC schedules currently applicable in areas SA–2 and SA–3 fall short of the levels in effect during the base year—that is, those which had complied with section 402—by substantial amounts. Rounding the above computations off to the nearest dollar the increases required to comply with section 402 are:

### FAMILY SIZE

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|
| SA–2 | $1 | 9 | 15 | 18 | 29 | 20 | 39 | 36 | 30 |

### FAMILY SIZE

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|
| SA–3 | $4 | 11 | 17 | 20 | 30 | 21 | 40 | 37 | 32 |

## V. RETROACTIVE APPLICATION OF ORDER

■ Plaintiffs seek to invoke the equity powers of this Court to grant plaintiffs and other members of their class the amounts they would have received, over and above what they actually did receive, if the State's AFDC payment schedules had been in compliance with section 402 since July 1, 1969. Un-

der the mandate of the Supreme Court, this Court lacks power to grant such relief. The mandate is quite clear: either approve the State's program or restrain the further use of federal monies in the State's AFDC program. It stated explicitly:

> "The District Court shall retain jurisdiction to review * * * any revised program adopted by the State, or, should New York choose not to submit a revamped program by the determined date, issue its order restraining the further use of federal monies pursuant to the present statute." Rosado v. Wyman, 397 U.S. 397, 421–422, 90 S.Ct. 1207, 1222, 25 L.Ed.2d 442 (1970).

This is no idle dictum. As the differences within both the Second Circuit panel and the Supreme Court made clear, a primary issue in the litigation was whether the courts should abstain completely and, if not, how deeply they should become engaged in state-federal welfare issues. Concern over the strong implications for federalism implicit in congressional decisions to encourage state administered AFDC programs undoubtedly motivated the Supreme Court to emphasize that the State was to be given a choice.

Supporting this conclusion is the fact that the Supreme Court afforded the State time to revise its program before the district court was empowered to consider a restraint on the further use of federal money in the State AFDC program. Rosado v. Wyman, 397 U.S. 397, 421–422, 90 S.Ct. 1207, 1222, 25 L.Ed.2d 442 (1970). If a remedy for underpayments had, in a sense, vested, this limitation on the district court's power would have been inappropriate.

■ In theory, this Court could condition its order in such a manner that the State would be required to refund the federal monies expended in its AFDC program since July 1, 1969 unless it now paid back the millions of dollars it has improperly denied AFDC recipients. Cf. Griffin v. County School Bd., 377 U.S. 218, 232–233, 84 S.Ct. 1226, 1234, 12 L.Ed.2d 256 (1964); Gautreaux v. Chicago Housing Authority, 304 F.Supp. 736 (N.D.Ill.1969); Reynolds v. State Election Bd., 233 F.Supp. 323, 328–332 (W.D.Okla.1964); Developments in the Law—Injunctions, 78 Harv.L.Rev. 994, 1061–64 (1965); Sedler, Conditional, Experimental and Substitutional Relief, 16 Rutgers L.Rev. 639, 686–92 (1962). In practice, such an order would involve no choice at all. The State would be faced with either returning to the federal government some three quarters of a billion dollars or paying something in the order of one hundred million dollars to AFDC recipients. It would have to choose the latter alternative. Since the Supreme Court has ordered us to give the State a real, not a Hobson's choice, the theoretical road of such a conditional order is not open.

## VI. CONCLUSION

Defendants, their successors in office, agents and employees are enjoined from drawing on or using federal funds in the AFDC program after November 1, 1970 so long as 1) New York purports to pay 100% of need as the level of AFDC payments, and 2) need schedules SA–2 and SA–3 are lower than the following:

FAMILY SIZE

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | Ea. Add. |
|---|---|---|---|---|---|---|---|---|---|---|
| SA–2 | 70 | 124 | 176 | 225 | 282 | 314 | 374 | 412 | 448 | 41 |

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | Ea. Add. |
|---|---|---|---|---|---|---|---|---|---|---|
| SA–3 | 69 | 122 | 174 | 223 | 279 | 311 | 371 | 409 | 445 | 41 |

This case has been tried upon the facts without a jury. Findings of fact and conclusions of law, as required by Rule 52 of the Rules of Civil Procedure, appear in this memorandum of decision.

This order shall take effect on November 1, 1970.

So ordered.