Julia ROSADO, Lydia Hernandez, Majorie Miley, Sophia Abrom, Ruby Gathers, Louise Lowman, Eula Mae King, Cathryn Folk, Annie Lou Phillips, and Marjorie Duffy, individually, on behalf of all minor children, and on behalf of all others persons similarly situated, Plaintiffs-Appellees,

v.

George K. WYMAN, individually and in his capacity, as Commissioner of Social Services for the State of New York, and the Department of Social Services for the State of New York, Defendants-Appellants.

Nos. 353, 426, Dockets 35396, 35548.

United States Court of Appeals, Second Circuit.

Argued Oct. 8, 1970 and Nov. 24, 1970.

Decided Dec. 21, 1970.

Amy Juviler, Asst. Atty. Gen. (Louis J. Lefkowitz, Atty. Gen. of N. Y., Samuel A. Hirshowitz, First Asst. Atty. Gen., Michael Colodner, Asst. Atty. Gen., on the brief), for defendants-appellants.

Steven J. Cole, New York City (Nancy Duff Levy, Center on Social Welfare Policy and Law, New York City, Henry A. Freedman, Washington, D. C., Carl Rachlin, New York City, Lee A. Albert, New Haven, Conn., on the brief), for plaintiffs-appellees.

Edward R. Neaher, U. S. Atty., E.D. N.Y., Cyril R. Hyman, Asst. U. S. Atty., Wilmot R. Hastings, Gen. Counsel, Joel Cohen, Asst. Gen. Counsel, Esther G. Schiff, Regional Atty., Adele M. Blong, Deputy Regional Atty., New York City, HEW, for the United States as amicus curiae.

Before LUMBARD, Chief Judge, HAYS and FEINBERG, Circuit Judges.

FEINBERG, Circuit Judge:

This case comes to us for the second time upon the complaint of plaintiffs,

who are welfare recipients, that the New York State welfare program does not comply with the requirements of section 402(a) (23) of the Social Security Act, 42 U.S.C. § 602(a)(23)(1969). The history of the extensive prior proceedings is fully set forth in the earlier opinions of this panel, 414 F.2d 170, and of the Supreme Court, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442, and familiarity with them will be assumed. Briefly, the Supreme Court held that on July 1, 1969, defendants-appellants, the New York Commissioner of Social Services and the New York Department of Social Services, put into effect Aid to Families with Dependent Children (AFDC) schedules which "impermissibly lowered [the] standard of need by eliminating items that were included prior to the enactment of § 402(a)(23)." Rosado v. Wyman, 397 U.S. 397, 416, 90 S.Ct. 1207 (1970). The Court reversed the judgment of this court, which had vacated two injunctions of the district court, and remanded the case to the district court to review

> any revised program adopted by the State, or, should New York choose not to submit a revamped program * * *, issue its order restraining the further use of federal monies. * * *

*Id.* at 422, 90 S.Ct. at 1222.

New York State chose to revise its AFDC program effective June 1, 1970, in a complicated manner explained more fully below. Plaintiffs contended in the district court, as they had before, that New York had improperly lowered its pre-July 1969 standard of need and that since New York purported to pay benefits covering 100 per cent of that standard, the payments to welfare recipients were too low. Defendants maintained that its new schedules were not based on a lowering of the standard of need. A full hearing was held before Judge Weinstein at which the Department of Health, Education and Welfare made its views known. This time Judge Weinstein agreed in large part with the State, at least with regard to AFDC benefits in New York City and seven suburban counties covered by a schedule known as SA–1,[1] which accounts for the bulk of AFDC payments in the State. The judge so ruled in an opinion dated October 27, 1970, 322 F.Supp. 1173. Plaintiffs have not appealed from that portion of the district court's opinion, so that the determination as to the SA–1 standard of need and level of payments is now final. However, the district court also held that the State has not met the required standard of need in 42 northern counties (SA–2)[2] and in eight western counties (SA–3).[3] The judge's findings and conclusions as to these areas were embodied in two opinions: one, dated September 16, 1970, granted plaintiffs a preliminary injunction, and the other, dated October 27, 1970 and referred to above, granted a permanent injunction.

Defendants appealed from both orders, and we stayed them pending disposition of the appeals. The ultimate effect of the orders was to raise the standard of need, and therefore the level of payment of benefits so long as New York continues to pay 100 per cent of need, in the SA–2 and SA–3 areas of New York State; the permanent injunction raised the standard slightly higher than that required by the preliminary injunction.[4] However, the orders did not require the State to make the higher

---

1. The counties of Dutchess, Greene, Monroe, Nassau, Suffolk, Ulster and Westchester.

2. The counties of Albany, Broome, Cayuga, Chemung, Chenango, Clinton, Columbia, Cortland, Delaware, Essex, Franklin, Fulton, Hamilton, Herkimer, Jefferson, Lewis, Livingston, Madison, Montgomery, Oneida, Onandago, Ontario, Orange, Orleans, Oswego, Otsego, Putnam, Rensellaer, Rockland, St. Lawrence, Saratoga, Schnectady, Schoharie, Schuyler, Seneca, Sullivan, Tioga, Tompkins, Warren, Washington, Wayne and Yates.

3. The counties of Alleghany, Cattaraugus, Chautauqua, Erie, Genesee, Niagara, Steuben and Wyoming.

4. See Appendix A.

payments which would then be called for. In accordance with the Supreme Court's mandate, the State was enjoined only from receiving federal monies while its plan failed to comply with section 402(a)(23).[5] The appeals from the September preliminary injunction and the October 27 permanent injunction were heard separately, but before the same panel. For reasons stated below, we affirm the permanent injunction and hold the September order moot.

## I.

The prior proceedings have been complex, due in part to a controversy over the subtle oddities of three-judge court jurisdiction. The issues before us now are comparatively simpler to state in their ultimate form, although explaining them, as will be seen below, requires considerable factual detail. As to the preliminary injunction, defendants-appellants argue to us only that there is no justiciable controversy with regard to levels of payments in the upstate areas covered by schedules SA–2 and SA–3 because all of the plaintiffs live in the SA–1 downstate area. As to the permanent injunction, appellants repeat this argument and add two more: that the challenge to the upstate schedule is moot because of an intervening decision of the District Court for the Northern District of New York, and that, in any event, Judge Weinstein erred in holding that the SA–2 and SA–3 standards of need had been lowered from their pre-July 1969 level.

Turning first to the claim that there is no case or controversy, appellants point out that no named plaintiff resides in the upstate areas or will receive individual benefits from the order. Indeed, according to defendants, "there is every possibility"[6] that the named plaintiffs

will be adversely affected by it. It is conceded that the State may choose to pay benefits of less than 100 per cent of the standard of need. *Rosado, supra,* 397 U.S. at 413, 414 n. 17, 90 S.Ct. 1207. Therefore, according to defendants, the named plaintiffs could actually be injured if the State decided to reduce the percentage of benefits paid to AFDC recipients across the State, using the district court schedule as 100 per cent of need for the SA–2 and SA–3 areas. The State's argument is as follows: The present schedules, exclusive of shelter costs paid separately, for families of four provide the following monthly payments:

| | |
|---|---|
| SA–1 | $231 |
| SA–2 | 207 |
| SA–3 | 203 |

The schedule adopted by the district court's permanent injunction would instead provide the following:

| | |
|---|---|
| SA–1 | $231 |
| SA–2 | 225 |
| SA–3 | 223 |

If the State chose to accept these as the proper standard of need, but elected to pay statewide benefits of only 95 per cent instead of 100 per cent of need, payments would be approximately as follows:

| | |
|---|---|
| SA–1 | $219 |
| SA–2 | 214 |
| SA–3 | 212 |

This would limit State AFDC payments upstate to modest increases, but materially reduce payments to downstate residents, including plaintiffs. Accordingly, argue defendants, plaintiffs have no personal stake in the outcome, see Jenkins v. McKeithen, 395 U.S. 411, 423, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969), and their

5. The orders have prospective application only. Although plaintiffs argued that retroactive payments should be required because the State had been violating § 402(a)(23) for over a year, the district court interpreted the Supreme Court's

mandate as prohibiting an order requiring either retroactive payments or refund of federal monies. Plaintiffs have not appealed this interpretation and it is, therefore, final.

6. Brief for Appellants in 35396, at 11.

interest is at best the same as, rather than adverse to, that of defendants.

The argument has a superficial logic which quickly disappears in the face of other facts, not emphasized by the State, and the history of the proceedings to date. When this litigation commenced in April 1969, the statutory scheme contemplated that, effective July 1, 1969, there would be two geographical areas for AFDC payments—one for New York City and the other for the rest of the State. This was done by the newly enacted section 131–a of the New York Social Services Law, McKinney's Consol. Laws, c. 55, which plaintiffs were then attacking because, *inter alia*, it eliminated special grants throughout the State.[7] When the complaint was filed, named plaintiffs resided in both of these areas. Two temporary restraining orders and a preliminary injunction entered by the district court in April and May 1969 all enjoined the elimination of special grants throughout the State. On June 5, 1969, defendants administratively divided the non-New York City area into three separate areas.[8] This made a total of four areas in the State, and named plaintiffs then resided in only two: the area for New York City alone, and the newly-created area for the seven counties near the City. Thus, the alleged lack of a justiciable controversy stems directly from the State's changes in the areas of payments. Indeed, the four areas were changed again in 1970 to the present three by combining New York City and the seven nearby counties into one area, now known as SA–1.[9] This only emphasizes that if defendants' argument were accepted, plaintiffs' right to litigate obviously substantial questions would be at the mercy of defend-ants' administrative power to subdivide the State geographically. Cf. Kennedy Park Homes Association, Inc. v. Lackawanna, 436 F.2d 108, 112 (2d Cir. 1970).

Moreover, the timing of appellants' argument gives pause. On June 18. 1969, after four geographical areas were created, Judge Weinstein entered an order permanently enjoining the elimination of special grants "throughout the State." Yet, defendants did not argue that the injunction be limited to only the two areas in which named plaintiffs then resided. Thereafter, on appeal to this court, and before the Supreme Court on certiorari, defendants still did not make such a claim. The Supreme Court noted that the "heart of this dispute is the elimination of special grants in New York program," *Rosado, supra,* 397 U.S. at 419, 90 S.Ct. at 1221, not confining its review to any particular area in the State. And the Court's remand contemplated that the State would offer "new schedules" or lose the right to federal funds. *Id.* at 420, 90 S.Ct. 1207. Use of the plural *could* only refer to schedules for different areas of the State. Like the plaintiffs and the courts, defendants have consistently assumed that the State's entire AFDC plan has always been properly at issue, not just that portion applicable to the areas where plaintiffs reside.

In addition, the named plaintiffs have had and continue to have a personal interest in the litigation. From the first, plaintiffs have sought a ruling, *inter alia,* that the standard of need in New York City and the nearby counties has been too low. While plaintiffs lost on that issue in the district court on the remand, and have since decided not to appeal, that hardly determines whether

---

7. New York City was covered by § 131–a (2), the rest of the State by § 131–a (3). The law was to become effective July 1, 1969.

8. This was done pursuant to an amendment to § 131–a, enacted after the complaint was filed, which gave defendants the authority to promulgate higher schedules outside of New York City. See

Rosado v. Wyman, 304 F.Supp. 1354, 1355–1356 (E.D.N.Y.1969) (three-judge court).

9. See Rothstein v. Wyman, 303 F.Supp. 339 (S.D.N.Y.1969) (three-judge court), vacated and remanded per curiam, 398 U.S. 275, 90 S.Ct. 1582, 26 L.Ed.2d 218 (1970).

there was a justiciable controversy before the district court.[10] Nor does the spectre defendants invoke of plaintiffs actually litigating against their own interest render the case nonjusticiable. Plaintiffs originally argued that section 402(a)(23) prohibits any downward adjustments of either the level of payments or the standard of need. Defendants, of course, disagreed. That the Supreme Court confirmed the State's view as to its power to reduce the level of payments, *Rosado, supra,* 397 U.S. at 413, 414 n.17, 90 S.Ct. 1207, changed neither the nature of the case nor the interests of the plaintiffs. The Court found that one of the purposes of section 402(a)(23) was to force "a State to accept the political consequences" of paying benefits at a rate of less than 100 per cent of the acceptable minimum need. *Id.* at 413, 90 S.Ct. at 1218. Certainly it is in the interests of plaintiffs to achieve that congressional goal. Moreover, there has always been the possibility that New York might decide not to use federal funds at all and to diminish the benefits paid to plaintiffs below the 1968 level. The availability of that option did not make the case nonjusticiable in the earlier stages of the litigation and neither it nor the option of reducing the level of benefits do so now.

Finally, as we pointed out in our prior decision, 414 F.2d at 173, and as the Supreme Court recognized, 397 U.S. at 399, 90 S.Ct. 1207, this action was originally brought as a class action under Fed.R. Civ.P. 23. Judge Weinstein noted in his October 27, 1970 opinion:

> It would be hard to visualize a Rule 23 case more appropriate than this one for resolution on a statewide basis. The validity of the statewide plan is at stake. If it is struck down in any of its parts then no money can

be received from the federal government for New York's AFDC program. Any decision to require a change in the State's standard of need in any part of the State will affect the expenditures of the State and the State may meet its budgetary problem by reducing the percentage of payment to less than 100% of its standard of need; a percentage reduction would have to be uniform across the State and thus would affect every recipient of AFDC aid in the State. 322 F. Supp. 1192.

The judge concluded that the requirements of a Rule 23 class action were all met, that plaintiffs as the representative parties have "fairly and adequately" protected the interests of the whole class and that there was no adverse or antagonistic interest between upstate and downstate welfare recipients. We agree with those conclusions.

■ In sum: The prior history of this litigation, including the mandate of the Supreme Court, notions of fair play and estoppel, analysis of the nature of plaintiffs' individual interests and Rule 23 all suggest that there is indeed a justiciable controversy here. Since this is the only basis for defendants' appeal from the September injunction, we would ordinarily affirm that order. However, the September order was a preliminary one applying by its terms only "during the pendency of this action." The October 27 permanent injunction has replaced it so that the earlier order is now technically no longer operative. We have engaged in this extended discussion of the only legal issue raised on the appeal from the preliminary injunction because the same argument applies to the permanent injunction as well, so that our ruling on the issue is necessary in any event. But we

---

10. In addition, it is somewhat misleading to characterize the result below even as to SA–1 as a loss for plaintiffs. In deciding that the 1970 SA–1 standard of need was not lower than the 1968 standard, the district court established the content and value of the earlier standard. See Part III, *infra.* Plaintiffs certainly benefit by the latter finding because it will serve as a simplied means of testing future standards.

conclude that the appeal from the preliminary injunction is moot.

## II.

We turn now to appellants' argument that the entire challenge to the SA–2 and SA–3 schedules is moot. This claim is based on the recent decision of the District Court for the Northern District of New York in Boddie v. Wyman, 323 F.Supp. 1189 (N.D.N.Y.), aff'd, 434 F.2d 1207 (2d Cir. 1970). In that case the State was enjoined from enforcing the current SA–2 and SA–3 schedules, and required to promulgate for the upstate counties schedules identical to those used in New York City (SA–1) until such time as the State demonstrates that the cost of living is higher in New York City than elsewhere in the State. Boddie, supra, at 1207. Appellants argue that because the Boddie order requires them to raise the upstate schedules to levels higher than those required by the final injunction here, the instant case is moot. For reasons explained below, we do not agree.

Although both cases grant similar relief, they resolve different legal issues and protect different interests of the plaintiffs. Boddie involves the question whether the State complied with the uniformity requirements of the Social Security Act and the regulations promulgated thereunder.[11] The plaintiffs here, on the other hand, challenge the State's compliance with a different provision of the Act.[12] Moreover, the relief granted in Boddie does not render redundant the relief granted here. Because the plaintiffs in Boddie seek uniformity of treatment, the State can comply with the order by lowering the SA–1 schedule and applying the lower schedule statewide. Plaintiffs in the instant case, however, seek a "floor" under which the level of the standard of need may not be reduced. Indeed, so long as New York purports to pay 100 per cent of need, the "floor" applies to the level of payments as well. Plaintiffs in this case do not ask the State to maintain a statewide uniform standard of need. Rather than mooting this case, Boddie supplements and reinforces the relief granted plaintiffs. Therefore, we hold that the case is not moot.[13]

## III.

Finally, we turn to the merits of the appeal from the permanent injunction. At the outset a brief analysis of Judge Weinstein's two orders will be helpful. The schedules now in effect for AFDC recipients provide the following relevant amounts monthly for a family of four:[14]

| SA–1 | $231 |
| SA–2 | 207 |
| SA–3 | 203 |

In his September opinion, the judge did not deal with the SA–1 schedule. At that time, the Department of Health, Education and Welfare (HEW) was still studying the available data and had not yet taken a position on whether the SA–1 schedule complied with section 402(a)(23). However, the judge then found it clear, by using only the figures supplied by the State and accepting all of its contentions regarding disputed items, that the new SA–2 and SA–3 schedules did not comply with section 402(a)(23) because they did not include the value of some former items of need. Based on those figures, Judge Weinstein held that in order to comply, the SA–2 and SA–3 schedules had to be raised to $221 and $218, respectively. Although this was a

---

11. 42 U.S.C. §§ 602(a)(1), (2), (3), and 1382(a)(1), (2), (3) (1964); 45 C.F.R. § 233.20(a)(1), (2) (1970).

12. Section 402(a)(23), 42 U.S.C. § 602(a)(23) (1969).

13. Appellants also appear to argue that by granting the final injunction after the preliminary injunction in Boddie was

granted, Judge Weinstein abused his discretion. For the reasons expressed above, we find that there was no abuse of discretion.

14. This is exclusive of certain items, e. g., shelter. The full schedules are set out in appendix B.

very significant increase over the levels already in effect, the only argument defendants made on appeal from that order was the non-justiciability point discussed in Part I of this opinion.

In his October 27 opinion, the judge for the first time held that the SA–1 schedule complied with section 402(a) (23). As to the SA–2 and SA–3 schedules, the judge resolved various items in dispute and increased the amounts fixed in the prior order for these areas to $225 and $223, respectively. Plaintiffs point out that logically defendants can attack only the comparatively minor differences between the SA–2 and SA–3 schedules in the preliminary injunction and those in the permanent injunction. As noted below, however, defendants do argue on this appeal that the entire amount of the SA–2 and SA–3 increase over the present schedules was improper. We have some difficulty in reconciling this difference in defendants' approach, but we will nevertheless deal with their arguments ·in turn. These are that the district court should have decided the basic issue before it in favor of defendants without a statistical study at all, that the district court's computations were erroneous and that the court improperly included in the 1970 standard of need five special need items.

Before considering these contentions, it is necessary to recapitulate briefly what the State has done. The Supreme Court in Rosado v. Wyman, *supra*, 397 U.S. at 416, 90 S.Ct. at 1219, stated what had occurred up to the point of the Court's decision in April 1970:

> Prior to March 31, 1969, New York computed its standard of need on an individualized basis. Schedules existed showing the cost of particular items of recurring need, for example, food and clothing required by children at given ages. Payments of "recurring" grants were made to families based on the number of children per household and the age of the oldest child. Additional payments, designated as "special needs grants," were also made. Under an experiment in New York City instituted August 27, 1968, many allowances for special needs were eliminated and a flat grant of $100 per person was substituted.

> Chapter 184 of the Session Laws, the present § 131–a, radically altered the New York approach. In lieu of individualized grants for "recurring" needs to be supplemented by special grants or the flat $100 grant, New York adopted a system fixing maximum allowances per family based on the number of individuals per household. The maximum dollar amounts were established by ascertaining "[t]he mean age of the oldest child in each size family." * * * While these family maximums are exclusive of rent and fuel costs, the District Court found that "[s]pecial grants were seemingly not included in these computations. No attempt was made to average them out across the State and then to add that figure to that of the basic recurring grant."

Thus, the effect of the July 1, 1969 statutory change was to eliminate from the State program all special grants, i. e., those provided to applicants where need for the item, such as a special diet, was shown on an individual basis. This, as the Court noted, was the "heart of this dispute." *Id.* at 419, 90 S.Ct. 1207. The Court found that elimination of special grants substantially altered the content of the standard of need so "that it [was] less than it was prior to the enactment of § 402(a)(23)," and that this was impermissible. *Id.* The Court did not explicitly state which items had been eliminated or reduced, or in what amount, but it emphasized that the total reduction was substantial. However, the State was given an opportunity to present a new program before losing federal monies. The Court specifically noted that

> a State can demonstrate that the items formerly included no longer constituted part of the reality of existence for the majority of welfare recipients. We do not, of course, hold that New York may not, consistently with

the federal statutes, consolidate items on the basis of statistical averages. \* \* \* Providing all factors in the old equation are accounted for and fairly priced and providing the consolidation on a statistical basis reflects a fair averaging, a State may, of course, consistently with § 402(a)(23) redefine its method for determining need. \* \* \* Lest there be uncertainty we also reiterate that New York is not foreclosed from accounting for basic and recurring items of need formerly subsumed in the special grant category by an averaging system like that adopted in the 1968 New York City experiment with cyclical grants.

*Id.* at 419–420, 90 S.Ct. at 1221.

After remand, the State submitted its revised program to the district court in May 1970. It consisted of a new statute, Ch. 517, Laws of 1970, and various regulations establishing levels of grants and allowances in various parts of the State. The new program did not return to the system of special grants for special needs in effect prior to the illegal cutback on July 1, 1969. Nor were these special need items consolidated on a "statistical basis," as the Supreme Court had suggested, by a "fair averaging" and then added to the flat grant. Rather, the State chose to ignore substantially its prior standard and to use instead a modification of a standard issued by the United States Department of Labor.[15] That change accounts for the extraordinary difficulty that the parties and the

district court have had in determining whether "all factors in the old equation" have been accounted for, the issue before the district court on remand.

The new schedules were effective June 1, 1970. Defendants submitted to Judge Weinstein an affidavit of a State official explaining how the new statute and schedules purportedly complied with section 402(a)(23) for the SA–1 area. No explanation was given to the district court as to how the schedules for SA–2 and SA–3 were determined.[16] After reviewing the State's submission at Judge Weinstein's suggestion, HEW advised the district court that it was not satisfied that all items in the former standard of need were now provided for. It appeared to HEW that the new schedules might "fall somewhat short of equating to the 1968 updated standard."[17] HEW concluded that

so many questions arise that we cannot arrive at a firm judgment as to whether the resulting standard, the $231 allowance [for a family of four in SA–1], is justified and in accordance with the Supreme Court decision.[18]

HEW pointed out that under the Supreme Court decision it was "incumbent on the State to come forward with a plan"[19] that complied with section 402(a)(23). The district court agreed with these conclusions and ruled that defendants had not adequately justified their new schedules.

■ Thereafter, the parties embarked upon a statistical survey, which is discussed below. But it is at this point

15. Bureau of Labor Statistics Lower Living Standard. See U. S. Department of Labor, Bureau of Labor Statistics, Three Standards of Living for an Urban Family of Four Persons, Bulletin No. 1570–5 (1967).

16. On close examination, it appears that the State has not revised the SA–2 and SA–3 schedules since the Supreme Court's decision in *Rosado*. Another statute, Ch. 120, Laws of 1970, passed prior to that decision and with an effective date of April 1, 1970, increased all schedules by approximately 10% above the amounts originally challenged in this

action. Chapter 517, Laws of 1970, while impliedly repealing Chapter 120, only increased the schedule for New York City. The regulations promulgated pursuant to Chapter 517 included the seven suburban counties within the increased New York City schedule (SA–1) but maintained the same schedules for SA–2 and SA–3 as were established pursuant to Chapter 120.

17. Memorandum for the United States as amicus curiae at 17, filed June 24, 1970.

18. *Id.* at 18.

19. *Id.* at 24.

that defendants' first objection to the permanent injunction on the merits should be considered. Defendants claim that the district court should have decided without any statistical study that the new schedules complied with section 402(a)(23). The argument is clearly without merit. In view of HEW's position, the district court acted well within its discretion in obtaining and then using a statistical study. Indeed, in light of the State's own decision to utilize a new computation system that made comparison of 1970 with 1968 most difficult and its burden to justify the new schedules, the district court's ruling can only be regarded as a wise attempt to avoid even the appearance of arbitrariness and to obtain basic information necessary to a fair decision.

Defendants argue to us that the study was unnecessary because upstate residents now receive more money than they did in 1968, the sums they receive are above the HEW definition of poverty level and the amounts are greater than those paid in most northeastern states. The last two contentions are irrelevant to whether the current levels are lower than New York's 1968 standard. The first contention, while superficially appealing, does not require reversal. It is true that grants provided by the 1970 SA-2 and SA-3 schedules are higher than the basic recurring grants provided by the comparable 1968 schedules,[20] but the 1968 figures pointed to by the State do not include the value of the special need grants that were also available at that time. The State's comparison, therefore, does not resolve the precise issue that was before the district court: Were all items of need used in computing the standard in 1968 accounted for and fairly priced in the 1970 standard? Accordingly, we conclude that use of the statistical survey was proper.

Once the court decided that further information was necessary, the parties agreed on the nature of the survey of payments to recipients under the AFDC program. A comparison would be made between current flat grant payments and payments made during the base period, which included both the basic recurring grants and the special need grants. The base period had been defined by the district court as July 1, 1968 to June 30, 1969.[21] Although the value of the recurring grants during the base year was known from the former schedules, the value of the special need grants was not because they had been paid only upon individual application and verification. Therefore, a statistical sampling of the AFDC case load was made to determine the average value per recipient per month paid for special need items. Since with special need items past payment was proof of need, the dollar value obtained could be used as an indication of need in the base year. The results of the survey of special need grants would be added to the recurring grants for each schedule and the sum obtained would be compared to the current schedules.

A number of factors made it difficult to conduct the survey. There were no full records for special need payments during the base year, and, except for New York City, there were hardly any records at all. Even in the New York City area, the survey was complicated by changes in record keeping since the base year and by lack of computer records. Moreover, during the base year itself there were a number of significant changes in the AFDC program. One of them was the introduction of the so-called cyclical grant in New York City, discussed below, to substitute for some special need items. However, the survey was made, under the supervision of defendant Department of Social Services, and all agreed that because of the lack of records in any area except New York City the results obtained from the sample would be treated as a uniform result for the entire state. This stipulation was explicitly accepted in open court by counsel for the State.

---

**20.** See note 16 *supra.*

**21.** Plaintiffs objected to the use of this year as the base period.

After the survey was completed, there were no objections to the extent of the sample (3,343 actual case files were examined) or to the sampling techniques used. Cf. Zippo Mfg. Co. v. Rogers Imports, Inc., 216 F.Supp. 670, 682–686 (S.D.N.Y.1963); Coordinating Committee for Multiple Litigation, Manual for Complex and Multidistrict Litigation 2.612 (1969). And defendants offer none now. They do, however, object to the method used to compute the value of two special need items, depleted wardrobe and household furnishings replacement. Because the dispute centers on the cyclical grant in New York City, an explanation of that project is necessary.

During the base year, special grants for replacement of clothing and household furnishing were paid in two ways. For two months, July and August, and for the entire year outside of New York City, these allowances were paid only when need was determined to exist on an individualized basis. In September, the two items were replaced by a demonstration project whereby a flat amount, $100 per person per year paid quarterly, was provided for all recipients in New York City. This cyclical grant took the place of individualized determinations of need and operated in the City for the rest of the base year. Defendants contend that the district court erred because it used a weighted average of the amount paid as individualized grants for two months and the amount paid as cyclical grants for the rest of the year rather than pro-rating the cyclical grant for the entire year. We do not agree. The aim of the survey was to average actual payments made during the base year to determine a fair estimate of the value of the special need items. Moreover, HEW recommended the course that Judge Weinstein took. Under these circumstances, we cannot say that the district court's method of computation was improper.

The final point on defendants' appeal concerns whether certain special need items, for which the survey furnished an average amount paid in the base year, had to be accommodated within the 1970 need schedules. In the district court after the survey was completed, defendants agreed that at least 15 former special need items had not been included in the current flat allowance although they should have been, e. g., sums for special diet, household supplies, and utility-electricity. Plaintiffs argued that ten additional items of special need had to be accounted for in the new schedules. As to five of these, HEW agreed with plaintiffs; as to the other five, HEW agreed with defendants. Recognizing "the special expertise of HEW," Judge Weinstein followed its recommendations. Defendants claim that the judge erred as to the five items included over their objections. With regard to four of them—add-on for additional adult, handicap allowance, guide fees, and diaper service—defendants urge that the items are no longer "part of the reality of existence for the majority of welfare recipients." See *Rosado, supra*, 397 U.S. at 419, 90 S.Ct. at 1221. Defendants emphasize that "[n]othing in the brief of HEW nor the opinion of the Court * * *" refutes an affidavit to that effect of a State Deputy Commissioner of Social Services. It is true that neither HEW nor the district court dealt explicitly with this argument, probably because it was made at the very last moment.[22] But that is hardly controlling. As to four items (add-on for additional adult, handicap allowance, guide fees, and school expenses), HEW had concluded that there was no apparent satisfactory basis for excluding them from the current standard of need. As to the fifth—diaper

22. The affidavit is dated October 22, 1970, and was filed on October 23, 1970. The HEW memorandum addressed to the survey was submitted on October 5, 1970. The judge's opinion was filed on October 27, 1970. Defendants had apparently not made this argument before the judge filed his opinion in September granting the preliminary injunction.

service—HEW pointed out that in the base year, this expenditure in New York City was included in the amount of assistance granted for which state and federal reimbursement was claimed. The district court was not required to accept the conclusory statement of defendants' Deputy Commissioner. It could properly rely on HEW's conclusions as well as on the common-sense inference that if an item was provided in 1968, it might well remain "part of the reality of existence" for a welfare recipient in 1970. We regard the judge's conclusion that these items had to be accounted for in the current basic allowance as making such a justifiable determination.

In sum, on this phase of the case, we have carefully reviewed the district court's findings of fact and conclusions of law. In every substantial respect, Judge Weinstein concurred with the recommendations of HEW. As to the most important issues which were in dispute before him, he agreed with defendants; e. g., the schedules for the SA–1 area were held to comply with section 402(a) (23). When he ruled against defendants, his findings of fact were not clearly erroneous and his conclusions of law were proper. We have considered all of defendants' arguments for reversal and do not find them persuasive.[23]

In conclusion, there was and is a justiciable controversy between the parties, the entire case is not moot although the appeal from the preliminary injunction is, and the district court did not err in holding that the schedules in the SA–2 and SA–3 areas are not in compliance

with section 402(a) (23). Accordingly, on the appeal from the permanent injunction the order of the district court is affirmed and the stay is vacated. The appeal from the preliminary injunction is moot.

### APPENDIX A

*Levels Set by Preliminary and Final Injunctions*

1. Preliminary injunction:

Family Size

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | Ea. Add. |
|---|---|---|---|---|---|---|---|---|---|---|
| SA-2 | 68 | 121 | 172 | 221 | 277 | 307 | 366 | 407 | 442 | 41 |

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | Ea. Add. |
|---|---|---|---|---|---|---|---|---|---|---|
| SA-3 | 67 | 118 | 170 | 218 | 274 | 305 | 363 | 404 | 439 | 41 |

2. Final injunction:

Family Size

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | Ea. Add. |
|---|---|---|---|---|---|---|---|---|---|---|
| SA-2 | 70 | 124 | 176 | 225 | 282 | 314 | 374 | 412 | 448 | 41 |

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | Ea. Add. |
|---|---|---|---|---|---|---|---|---|---|---|
| SA-3 [A3614] | 69 | 122 | 174 | 223 | 279 | 311 | 371 | 409 | 445 | 41 |

### APPENDIX B

*Levels Currently in Effect*

Family Size

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | Ea. Add. |
|---|---|---|---|---|---|---|---|---|---|---|
| SA-1 | 84 | 134 | 179 | 231 | 284 | 329 | 374 | 419 | 464 | 45 |
| SA-2 | 69 | 115 | 161 | 207 | 253 | 294 | 335 | 376 | 417 | 41 |
| SA-3 [A3615] | 65 | 111 | 157 | 203 | 249 | 290 | 331 | 372 | 413 | 41 |

**23.** While we affirm the SA–2 and SA–3 levels set in the permanent injunction, we note what appears to be an error in the district court's computations. The October 27 opinion sets forth the results of the survey, including the values in the base period of the basic recurring grant, the 20 special need items and the grants for clothing and household furnishing replacement. The values for the 20 special need items used in the SA–1 computations differ, however, from the values for the same items used in computing the SA–2 and SA–3 standards. Because of the agreement to extrapolate the results of the survey statewide, we are unable to explain this apparent inconsistency. Although the parties have not raised this issue, we have recomputed all three schedules using both values. We find that the result of this recomputation makes insubstantial changes in the values of the base year standards and, rounding off to the nearest dollar as Judge Weinstein did, that the levels in the permanent injunction are not affected.